## Fuller & Fuller Co. v. Adolph Gaul, Henry Best, John J. Johnson, J. E. Norling and William G. King.

1. Secret Trust—*A Conveyance Absolute on its Face but Intended as a Mortgage.*—A conveyance of property which is absolute on its face, but which is really intended as a mortgage or security, is valid as between the parties, but is fraudulent and void as to creditors. ·

2. Fraud—*Sales to Hinder and Delay Creditors.*—A vendee who purchases property of an insolvent debtor for less than its value, thereby deprives the creditors of the difference, defeats their just expectations, and tends to hinder and delay them in the collection of their claims.

3. Insolvency—*Defined.*—Insolvency means a general inability to answer, in the course of business, the liabilities existing and capable of being enforced.

4. Vendor and Vendee—*Secret Understanding.*—A secret understanding between the parties to a sale, for a benefit to accrue or be reserved to the vendor, the conveyance being absolute in terms, is a fraud as to creditors of the vendor.

Creditor's Bill.—Appeal from the Circuit Court of Cook County; the Hon. Abner Smith, Judge, presiding. Heard in this court at the March term, 1899. Reversed and remanded with directions. Opinion filed November 2, 1899. Petition for rehearing denied.

Charles Lane, attorney for appellant.

B. M. Shaffner, attorney for appellees.

Mr. Justice Adams delivered the opinion of the court.

In a bill and supplemental or amended bill filed by appellant January 14, 1898, it is alleged that appellant, January

5, 1898, recovered a judgment against appellee Gaul for the sum of $1,440.51, which was for drugs sold by complainant to Gaul; that at said date it sued out execution on said judgment and delivered the same to the sheriff, who made a demand on Gaul, notified him to file a schedule, and returned the execution January 12, 1898, indorsed, "No property found and no part satisfied." The bill alleges that on or about December 10, 1897, Gaul was engaged in the drug business in the store number 657 North Clark street, in the city of Chicago, and about that date transferred to the defendant, Henry Best, his father-in-law, his entire stock of drugs, furniture and fixtures, including a soda fountain and cash register, and that Best is pretending to be in possession; that the transfer was made to place the property transferred beyond the reach of creditors, and to enable Gaul to control and enjoy the same; that since the transfer he has exercised authority as usual, and there is no evidence of change of possession except a small card hung in the store; that the stock and fixtures were worth $8,000 at the time of transfer, and that since the transfer, Best, in various conversations, admitted that Gaul owed him only $2,300 at the time of the transfer, and that he had no interest in the transferred property except as security for said sum; that said property constituted the entire estate of Gaul, and that at the time of the transfer Gaul owed other creditors besides complainant, which facts were known to Best; that Best and Gaul conspired to defeat complainant's claim, and that the transfer was fraudulent; that the soda fountain transferred to Best was worth $3,000; that on or about September 1, 1898, Gaul and Best, or one of them, made a pretended transfer of said stock of drugs, or such portion of them as then remained in the store, to John J. Johnson, who is now in possession and conducting said business, which transfer was merely colorable, etc., and August 31, 1898, said Johnson executed to William G. King a chattel mortgage of said property purporting to secure a note for $2,360, which mortgage was without consideration, etc., and that J. E. Norling claims an interest in said property as a

member of the firm of J. J. Johnson & Co., composed of
Johnson and Norling. The bill prays that the transfers to
Best and to Johnson be decreed to be fraudulent, that the
chattel mortgage be set aside as fraudulent, and that Best
may be decreed to be personally liable for the full amount
of Gaul's indebtedness to complainant, in case complainant
should fail to realize its judgment because of transfers, etc.
Answers were filed by all the defendants and replications
to the answers, the evidence was heard in open court, and
the court dismissed the bill and the amended or supple-
mental bill for want of equity.

The recovery of judgment by complainant, and the issu-
ing and return of execution, as averred in the bill, and that
judgment was for drugs sold by appellant to Gaul prior to
the transfer to Best, are facts proved by the evidence and
not controverted. Pierce, appellant's credit man, testified
that he first heard of the transfer to Best on the 10th or
11th of December, 1897, and that on the 23d of that month
he had a conversation with Best, in which Best said that
his daughter, who is Gaul's wife, told him, the night before
the bill of sale was executed, that appellant was pressing
Gaul for a settlement; that he said Gaul owed him $2,300;
that he wanted security; that he was an honest man, and
all he wanted was the $2,300; that the stock was worth a
great deal more than that; that Gaul told him it was worth
$8,000; that he, Best, thought it was worth $6,000, and
that if he could sell for that amount he wanted to pay all
creditors; that when the transfer was made to him he knew
Gaul owed appellant a large amount, and owed his landlord
about $300. This witness further testified that he sug-
gested to Best to turn the store over to appellant, on its
agreeing to run it to the best advantage, and to first pay
him $2,300, when Best said he wanted to talk with his
attorney before taking such a step; that the only objection
to it was that it would throw Gaul out of employment; that
if Gaul did not run the store, he and his family would be
on his, Best's, hands to take care of; that Gaul had nothing
outside of that store, and he wanted to save something for

Gaul; that he took the store with the understanding that Gaul was to continue to run it; that he himself was in the undertaking business and knew nothing of the drug business. This witness testified that he was in the store two months before the transfer to Best; that he understood there was some indebtedness on the soda fountain, and that the reasonable market value of the store December 10, 1897, subject to the indebtedness, was easily $6,000. Witness further testified that, before the close of the conversation, he sent for Lane, appellant's attorney. Charles Lane, appellant's solicitor, testified that, December 13, 1897, appellant's claim was given to him for collection, and on that day he went to the store, where he saw a pasteboard card, four by six, on which was marked, "This store has been transferred to Henry Best, who is now proprietor;" that he went to Best's office and talked with him, and that Best said the store had been transferred to him for $2,300; that he had heard that Gaul's creditors were pressing him, and he determined to have a bill of sale; that he had no disposition to beat any one, and believed the store valuable enough to pay not only the $2,300, but the claims of all Gaul's creditors; that he thought it best to hold the goods till summer before selling, and believed they could then be sold, all of Gaul's creditors paid, and something left for Gaul. He said Gaul was attending the medical school, and that at the time of transfer it was understood between Gaul and himself that Gaul should continue as manager of the store; that Gaul was his son-in-law, and had no property except the drug store, and that managing it was the only way he could get a living; that he, Best, knew nothing about the drug business. Lane further testified that after talking with Best he went back to the store and saw Gaul, who told him he owed Best $2,300 and gave him a bill of sale of the store, and that the store at the time of transfer was worth $8,000. Witness says he then returned to Best's office and had another talk with him, and Best said that when he got the bill of sale he knew that Gaul owed appellant, and also owed two or three months' rent. Witness

further says: "Gaul, the night of that day, told Best and me, in the drug store, that he owed his landlord $1,900, at which Best appeared surprised and disgusted. Best told me he thought the store worth $6,000 just as it stood, and Gaul told me, in Best's presence, that he owed $800 on the soda fountain and $47 on the cash register. Two or three days after that Best said he could, do nothing about appellant's claim then; that he could not sell the store; that the only thing was to wait till summer, when trade would be better, and the store could be sold to good advantage and creditors paid." Witness says that afterward he telephoned Best several times, telling him appellant would give him all the time he wanted if he would become responsible for its claim, and asking him to come to the company's office, which he finally did, and the credit man called him over. "I talked with Pierce and Best, and Best repeated in Pierce's presence, what he had said to me in regard to the transfer, the value of the store, the fact that the store constituted all Gaul's assets, and that he knew that Gaul, at the time of the transfer, was indebted to various creditors." Witness further testified that the sign he had previously referred to was over the cash register, in the corner, and from fifteen to eighteen feet back from the front door.

Herron, manager of the Onyx Soda Fountain Co., which manufactured and sold to Gaul the soda fountain in the store, testified that it was the handsomest fountain in the city; that December 10, 1897, it was worth from $2,000 to $2,500, and that there was then due on it from $800 to $1,000. He further testified that the fountain was sold to Gaul for about $1,800; that they were just starting in business then, and wanted a little advertising, but they would not duplicate the fountain for less than $3,000.

William F. Waldron, formerly clerk for Gaul, and who had been in the drug business six years prior to December 10, 1897, testified that at that date the property was worth $5,000 net. He says he understood Gaul owed $800 on the fountain.

Charles Sutcliffe, city salesman in the employ of appel-

lant for about twelve years, testified that he had had experience in buying and selling drug stores; that he had sold drugs to Gaul up to December, 1897, was in Gaul's store frequently during two or three years, and was familiar with his stock and fixtures, and that the store, its contents and the business, were worth $6,000 December 10, 1897, and would have sold for that amount. He says there was a sign over the cash register, and that one was put in the per-fume case a week or two after the transfer.

W. J. Hessler testified that he began to work for Gaul as drug clerk, in August, 1897, and so continued until April 30, 1898; that he went on duty at 6:30 o'clock A. M., and worked till ten o'clock P. M., being absent from duty during that time only about fifteen minutes; that Gaul told him of the transfer the next day after it occurred; that about a week after the transfer there was a sign put over the cash register, but that none was in the perfumery case, as he recollected, and that about three weeks after the transfer, a black sign about eighteen inches long and six inches wide, was placed outside; that on the sign in red or pink letters was, " H. Best, successor to," and underneath was Gaul's sign; that he saw Best in the store only three or four times between December 10, 1897, and April 30, 1898, and never saw him go behind the counter but once, and never saw him examine the cash register; that Gaul was the manager, and so continued till witness left; that he took the cash from the register, paid the help, kept the same books he used before the transfer, made out bills to customers on his own bill heads, none being printed in Best's name, and used his, Gaul's, own labels. " Gaul told me Best had nothing to do with paying the men. When I was going to leave he said if I left without notifying him, he would not pay me, and I went to Best, who told me to go to Gaul and get my money. Gaul afterward asked me why I went to Best, and I said I thought I was working for Best. He said I was not, that Best had nothing to do with it; that I was working for him."

Arthur B. Jackson testified that June 30, 1898, he pur-

chased goods at the store, for which he paid, and a receipt was given him which was headed, " In account with Adolph Gaul."

Harrison C. Jackson testified that June 23, 1898, he purchased a bottle of glycerine at the store, on the label affixed to which was: " Adolph Gaul, Prescription Pharmacist, 657 North Clark St., S. W. corner North avenue, Chicago."

Appellee put in evidence a bill of sale from Gaul to Best, of date December, 1897, the day not specified. The bill of sale is absolute on its face, and is expressed to be subject to mortgages on the soda fountain and cash register. It includes all personal property of every description in the store and the basement under the store.

Gaul testified that he was a medical student, and that while managing the store he left home to attend the medical college on Mondays, Tuesdays and Wednesdays at 8 :45 o'clock A. M., on Fridays at ten o'clock A. M., and on Saturdays at eight o'clock A. M., and returned sometimes at five, sometimes at six and sometimes at seven o'clock P. M., and that the salary he received as manager was $75 per month. He testified that the day before the sale to Best, the latter came to him and said :

" I hear that you are in a pretty bad fix." I said, " Yes." He said, ' I want some security for my money, or else I want the money.' He told me he wanted the money or ample security. I said, ' All I have is the store.' He said he understood I owed the landlord; I said I owed him $2,000, and I didn't think the store would bring $1,500; that, under favorable circumstances it might bring $5,000 if not taken out."

The witness further testified that Best was determined; would not give him any time, and that all he, witness, could do was to give him the store to secure his indebtedness to him. Witness also testified that signs were put over the cash register, in the perfumery case, and over the door, and that on the inside signs were the words, " Henry Best, successor to Adolph Gaul." What was on the outside sign he does not say.

Fuller & Fuller Co. v. Gaul.

John J. Johnson testified that he negotiated for the purchase of the store altogether with Gaul, and that the only time he saw Best in connection with the purchase was when the bill of sale was given and the deal closed; that the sale to him was made August 30, 1898, and the consideration was $8,000, $2,000 of which was paid in cash and the balance in 15,000 shares of gold mining stock of the par value of $1 per share.   He said the mine was being operated and he considered the stock valuable and a good investment, but did not know the market value and could not say that it was worth $6,000.   He also testified that he executed a chattel mortgage on the stock to William G. King, to secure payment of about $2,000.

Gaul testified that the stock and fixtures were worth $1,730 December 9, 1897.   The testimony of this witness, and also of Best, show clearly that Best exercised no more control over the store or business after than before the transfer; that, in fact, he exercised no control; also that the bill of sale from Gaul to Best was given merely as security for the indebtedness of the former to the latter.   Best's admissions to Pierce and Lane, which stand uncontradicted, show that it was the understanding, at the time of the alleged sale to Best, that Gaul would be continued as manager, in order that he might, by drawing a salary as such, be supported while pursuing his medical studies, and not be entirely dependent on Best, his father-in-law, for support. Best does not deny having made the statements and admissions testified to by Pierce and Lane, but merely says his memory is failing considerably and that he don't recollect having made them.

Best testified that it was security he wanted.   He was questioned and answered as follows:

Q.   "You didn't like to see Mr. Gaul thrown out on the street?"   A.   "No, sir."

Q.   "You wanted, in other words, to secure yourself and give Mr. Gaul some employment, did you not?"   A. "Yes, sir, as long as I had the store.   I wanted to get rid of the store.   I ain't no druggist; I didn't know how to run a drug store."

There is no evidence that Best assumed to pay any part of the back rent as part of the consideration of the sale to him.

"A conveyance of property which is absolute on its face, but which is really intended as a mortgage or security, is well enough as between the parties, but the settled doctrine is, that such a transfer of property is fraudulent and void as to creditors." Beidler v. Crane et al., 135 Ill. 92, 98.

The reason given for the doctrine is that in such case there is necessarily a secret trust for the benefit of the vendor, and that the natural and necessary effect of the instrument, in not disclosing the trust, is to mislead, deceive and defraud creditors. Ib.

That Gaul executed the bill of sale as security is proved by his own testimony. He testified : "There wasn't anything left for me to do but to sell him the store to secure my indebtedness to him." What Best wanted was his money or security, and Best's statements to Pierce, which are not denied, show conclusively that he regarded the bill of sale as merely a security. Else how could he say to Pierce that he was an honest man, and all he wanted was the $2,300; that Gaul told him the store was worth $8,000; that he thought it worth $6,000, and that, if he could sell it for that amount, he wanted to pay all creditors. And why did he state to Lane that he had no disposition to beat any one, and that he believed if the store should be held until summer and then sold, all Gaul's creditors would be paid ? This language would be appropriate coming from one who held the property in trust for creditors, but would be not only inappropriate, but absurd, if used by a purchaser of the property absolutely and in good faith.

We are of opinion, from the evidence, that the actual intention of the parties was to hinder and delay creditors other than Best, and that the bill was made for that purpose, and to secure Gaul's indebtedness to Best. The evidence shows clearly that Best knew that Gaul had other creditors; that the property in the store was all Gaul had; that he was in a " bad fix." He also believed, as he himself

says, that the property was worth $6,000, and he, as well as Gaul, must have known, on the hypothesis that they were moderately endowed with common sense, that for Best to take an absolute deed of the property merely as security, and continue the business with Gaul as manager, would necessarily hinder and delay Gaul's other creditors.    Gaul testified that at the time of the execution of the bill of sale he knew that it would delay appellant in the collection of its debt.

The consideration for the alleged purchase was grossly inadequate, if the bill of sale is to be regarded as absolute in fact, and not merely as a security.

Best only claims that Gaul owed him $2,300. The evidence is overwhelming that the property, when the bill of sale was executed, was worth net between $5,000 and $6,000.    Gaul, the only witness for appellees as to value, testified that it was worth only $1,730, but we do not think his evidence entitled to much credit.    Gaul testified that he told Best, before the transfer, that under favorable circumstances the store might bring $5,000, and Best told Pierce that Gaul told him it was worth $8,000, and his testimony, in other particulars, is inconsistent with his statement that the property was worth only $1,730.

"A vendee who purchases the property of an insolvent debtor for less than its value, thereby deprives the creditors of the difference, and defeats their just expectations." Bump on Fraudulent Conveyances (3d Ed.), p. 44; see also Dodson v. Cooper, 50 Kan. 680, and Mobile Savings Bank v. McDonnell, 89 Ala. 434.

"Insolvency means a general inability to answer, in the course of business, the liabilities existing and capable of being enforced." Brouwer v. Harbeck, 9 N. Y. 589, 593, and cases cited.

That such inability existed in Gaul's case was fully proved.

But in addition to the sale having been made as security to Best, and to hinder and delay creditors, the evidence tends strongly to show that another object was to secure a benefit or advantage to Gaul.    Best testified that he wanted

to secure himself and give Gaul some employment, so long
as he had the store; that Gaul had no income except what
he had from the store. The only objection that Best made
when Pierce, appellant's representative, suggested to him
to turn the store over to appellant, and that he should first
be paid from the proceeds of the business, was, that it would
throw Gaul out of employment; that if Gaul could not stay
there and run the store, he would be on his, Best's, hands
with his family, and he would have to take care of him.
Best also stated to Pierce and Lane that, at the time of the
transfer, it was understood that Gaul should continue as
manager of the store. Gaul was retained in the store as
manager, and was paid, or rather paid himself, $75 per
month for what he could do before business hours in the
morning and after five, six or seven o'clock in the evening,
which is certainly a very suspicious circumstance. A secret
understanding or agreement between the parties to a sale
for a benefit to accrue or be reserved to the vendor, the con-
veyance being absolute in terms, is a fraud as to creditors
of the vendor. Moore v. Wood, 100 Ill. 451, and cases cited.

Appellant's counsel contends that there was no such
change in the possession of the property as the law requires,
and we are inclined to that view. In Martin v. Duncan,
156 Ill. 274, certain property was attached as the property
of the defendant in error, George W. Duncan. The goods
were claimed by Robert Duncan, a brother of George. The
attachment was levied May 28, 1891, and on the 16th of
that month George had executed to his brother Robert a
bill of sale of the goods. The court thus states the case:

" George W. Duncan, against whom the suit was brought,
lived in Dixon, and had two stores, one in Dixon and one
in Ottawa. His brother, Robert Duncan, the defendant in
error, lived in Ottawa and managed the store in the latter
place from September, 1888, down to May 16, 1891, when
the transfer hereinafter mentioned is alleged to have been
made. The defendant in error, in the management of the
Ottawa store for his brother, George, sold goods, handled
the money, made deposits, paid for goods, paid bills by
checks, took out insurance, had no clerk, kept such books

as were kept, and had an agreement that he was to receive for his services $25 per month and his board. George Duncan came to Ottawa only occasionally, although the store was run in his name and advertised as his, and the stock levied upon is conceded to have been his until May 16, 1891. Up to that date Robert Duncan was merely the agent and representative of his brother, George, and his possession was until then the possession of George."

The court say :

" Up to May 16th defendant in error had been in possession as agent for his brother, and if, on May 28th, he was in possession for himself, the change in the character of the possession should have been indicated by such outward, open, actual and visible signs as could be seen and known to the public, or persons dealing with the goods. (Claflin v. Rosenberg, 42 Mo. 439.)   *   *   *   When the known and previously recognized agent of an alleged vendor remains in possession, the appearance to the world is the same as though the vendor himself remained in possession, unless there are substantial and visible signs of a change of title."

In the present case Gaul, who, prior to the execution of the bill of sale, was the owner, continued in possession and managed and controlled the business as he had done prior to the alleged sale, sold goods to the customers labeled " Adolph Gaul," and made out bills to customers headed, " In account with Adolph Gaul." He kept his accounts in the books formerly used by him. He retained in his employ Hessler, his former drug clerk, until April 30, 1898, nearly five months after the alleged sale, and told Hessler that Best had nothing to do with it, that he, Hessler, was working for him, and finally, sold the goods *en masse*, without any intervention on the part of Best, except that the latter signed the bill of sale. Best says that he left the whole matter of the sale to Johnson, including agreement as to consideration, to Gaul. The formal signing of the bill of sale to Johnson was substantially the sole act of Best in relation to the property, after the alleged sale from Gaul to him. Concisely stated, Gaul acted in all respects as if he were the sole owner of the store, and Best as if he had no pecuniary interest in it. Gaul testified that Best had no

key to the store, and was ignorant of the combination of the safe.

Counsel for appellees relies on the signs as indicating a change of ownership. It may be true that the card sign over the cash register, the one in the perfumery case, and the small one on the front door with the words, "Henry Best, successor to," on it, placed over the former sign of Adolph Gaul, might indicate to one observing them that there had been a change in the business, but we think the effect of such signs more than counterbalanced by the manner in which the business was conducted; besides, the primary question is, was there in fact a change of possession from Gaul to Best, because if there was not, the signs were as deceptive as was the bill of sale.

There is no evidence that Johnson, at the time he purchased the property, had any knowledge of the circumstances under which the alleged sale to Best was made, or that his purchase was not in good faith. This being true, and appellee Best having received the proceeds of the sale of property worth between $5,000 and $6,000, appellant is entitled to a personal decree against Best. Coale v. Moline Plow Co., 134 Ill. 350, 358.

The judgment will be reversed and the cause remanded, with directions to enter a personal decree in favor of appellant, the Fuller & Fuller Company, and against appellee Henry Best, for the sum of $1,440.51, with interest at the rate of five per cent per annum from January 5, 1898, till the date of the decree.

Reversed and remanded with directions.